IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00974-RM-MEH

AURELIO SANCHEZ,
DOMINGO SANCHEZ,
DANIEL HERNANDEZ,
MIGUEL ANGEL GODOY,
BENITA ARREOLA,
JOSE LUIS ARREOLA, and
CLARA ARRELOA, on their own behalf and on behalf of all others similarly situated,

     Plaintiffs,

v.

SIMPLY RIGHT, INC.,
CINEMARK USA, INC.,
DANIEL KILGORE, and
BEATRICE PERMANN,

     Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge**.

     Before the Court are Defendant Cinemark USA, Inc.'s Motion for Summary Judgment [filed November 11, 2016; ECF No. 123] and Plaintiffs' Motion for Partial Summary Judgment as to Cinemark USA, Inc.'s Status as a Joint Employer [filed November 18, 2016; ECF No. 134]. The motions are fully briefed and the Court finds oral argument (not requested by the partes) will not assist in its adjudication of the motions. For the following reasons, this Court respectfully recommends that Plaintiffs' motion be denied in part and denied without prejudice in part and that

Defendant Cinemark's motion be denied.[1]

## BACKGROUND

### I.     Procedural History

Plaintiffs (self-described janitorial employees of Defendant Simply Right, Inc. ("Simply Right") and their family members and friends working in Defendant Cinemark USA, Inc. ("Cinemark") theaters) initiated this action on May 7, 2015 and filed the operative Amended Complaint on July 10, 2015 alleging essentially that Simply Right, a cleaning service contractor, and Cinemark, the contracting party, failed to pay them minimum wages and overtime pay.[2] On August 21, 2015, the parties stipulated to stay the claims of certain Plaintiffs—Aurelio Sanchez, Domingo Sanchez, Miguel Godoy, Daniel Hernandez, Benita Arreola, and Opt-in Plaintiff Armida Raya—pending the conclusion of arbitration proceedings for each of these individuals.[3] The claims of the

---

[1]Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual and legal findings of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir.1991)).

[2]Plaintiffs' claims for overtime pay are asserted only against Simply Right and the individual Defendants. Am. Compl. ¶45. Cinemark is exempt from the obligation to pay overtime to its employees. *See* 29 U.S.C. § 213(b)(27).

[3]The Court was informed by counsel for the parties that these claims have settled; however, the Plaintiffs currently remain identified in this case and no action has been taken to dismiss these Plaintiffs. Therefore, the Court will proceed in this case according to the status as determined by the case docket—*i.e.*, the Court has approved the parties' stipulation to stay the

remaining Plaintiffs have proceeded through discovery.

The issue raised by the present motions concerns whether Cinemark is a "joint employer" with Simply Right necessary to demonstrate liability under the Fair Labor Standards Act ("FLSA"). Cinemark argues that its relationship with Simply Right was simply one of contractor/sub-contractor, and it had no supervision or control over Simply Right's employees. Plaintiffs counter that, although they were employed by Simply Right, they "worked on Cinemark's premises, with materials and equipment supplied by Cinemark," and "Cinemark managers used and directed [them] just like they were their own employees."

Notably, Plaintiffs bring their motion seeking judgment on behalf of themselves *and* the purported class. Therefore, to the extent Plaintiffs' motion is construed to seek judgment on behalf of the named Plaintiffs having claims currently before this Court—Jose Luis Arreola, Clara Arreola, Nazario Arreola, and Maribel Arreola—the Court will treat the Plaintiffs' motion and Cinemark's motion as cross motions for summary judgment.

However, Plaintiffs' motion also seeks judgment on behalf of the stayed Plaintiffs currently in arbitration. The Court finds that a ruling on behalf of the stayed Plaintiffs would constitute a "rul[ing] on the potential merits of the underlying claims," which is prohibited by Supreme Court precedent. *See AT&T Techs., Inc. v. Comm'cns Workers of Am.*, 475 U.S. 643, 649–50 (1986) ("even if it appears to the court to be frivolous, the [plaintiff's] claim that the employer has violated the [law] is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator."); *see also Int'l Bhd. of Elec. Workers, Local 111 v. Pub. Serv. Co.*, 773 F.3d 1100, 1109–10 (10th Cir. 2014) ("We recognize that as a general rule, 'in deciding whether the parties

case pending arbitration of the claims of the stayed Plaintiffs. ECF Nos. 40, 42.

have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims.'") (quoting *AT&T Techs., Inc.*, 475 U.S. at 649).  As such, the Court will recommend that Plaintiffs' motion on behalf of Plaintiffs Aurelio Sanchez, Domingo Sanchez, Miguel Godoy, Daniel Hernandez, Benita Arreola, and Opt-in Plaintiff Armida Raya be denied without prejudice.

Moreover, to the extent the Plaintiffs seek summary judgment on behalf of the class, Plaintiffs concede that "once a named plaintiff establishes individual standing, the issue of whether a named plaintiff can assert claims on behalf of absent class members is determined at the class certification stage of the litigation."  Reply, ECF No. 163 at 6–7 (citing *Indergit v. Rite Aid Corp.*, No. 08 Civ. 9361 (PGG), 2009 WL 1269250, at *4 (S.D.N.Y. May 4, 2009)).  Thus, until Judge Moore issues a ruling on certification, the Court cannot determine whether the named Plaintiffs may seek judgment on behalf of the purported class.  The Court recommends that Judge Moore reserve judgment as to whether the Plaintiffs may seek summary judgment concerning the joint employer issue on behalf of the purported class.

## II.    Findings of Fact

Cross-motions for summary judgment are examined under the usual Rule 56 standards, *Saieg v. City of Dearborn*, 641 F.3d 727, 733-34 (6th Cir. 2011), with the court viewing all facts and reasonable inferences in the light most favorable to the nonmoving party.[4]  *See Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 359 (7th Cir. 2011).

1.    Defendant Cinemark USA, Inc. ("Cinemark") is in the business of exhibiting movies.

2.    Defendant Simply Right, Inc. ("Simply Right") was formed in 2000. Simply Right is a

---

[4]Unless otherwise cited, these facts are undisputed.

janitorial services contractor that is "in the business of providing [janitorial services] to the general public and other businesses."

3.      Cinemark and Simply Right are separate and distinct legal entities.

4.      In approximately October 2006, Simply Right began providing janitorial services at some of Cinemark's movie theater locations.

5.      One location where Cinemark contracted with Simply Right to provide janitorial services was at the theater in Greeley, Colorado (the "Greeley theater"). Simply Right started performing janitorial services at the Greeley theater on or around May 1, 2011, and has done so to the present.

6.      In addition to Cinemark, Simply Right provides janitorial services to other commercial businesses and movie theater companies. Of the approximately 800 to 1,050 persons employed by Simply Right, only about 400 to 500 are assigned to clean movie theaters.

7.      Under the Janitorial Services Agreement ("JSA") between Cinemark and Simply Right, Simply Right agreed to perform cleaning services "nightly between box office close and two hours prior to theater opening."  JSA Addendum A, § V.a, ECF No. 124 at 32.

8.      Simply Right hired cleaners or custodians to perform janitorial services at Cinemark theaters, including the Greeley theater.

9.      Per the JSA, Simply Right was "solely responsible for any supervision of its employees deemed necessary by" Simply Right. *Id.*, Addendum A.  The JSA reserves to Simply Right the right of direction and control over the cleaners assigned to Cinemark's work sites, including the right to hire, fire, supervise, discipline, and reassign the cleaners. *Id.* II. § 2.7.  The JSA also provides that Simply Right "shall be solely responsible for the salary, worker's compensation, income tax withholding, unemployment, FICA, and all other aspects of employment regarding [Simply Right's]

employees." *Id.* II. § 2.14.

10.  Simply Right provides a written list of "Golden Work Rules" for its employees; a copy provided by Cinemark reflects a signature by Plaintiff Jose Arreola Ramos on March 13, 2013. ECF No. 123-4. These "Rules" include an arrival time, the requirement to "clock in and out each day," and an order to "discuss any issues such as time off, pay, job tasks[,] etc. with your direct supervisor[,] not the theater manager." *Id.*

11.  The JSA provides that Simply Right "agree[d] it will, at all times, provide and maintain an individual at [Cinemark's] work site (the ". . . Site Manager"), who shall be responsible for the daily on-site supervision of all [Simply Right] employees." JSA II. § 2.6.

12.  Armida Raya ("Raya") was employed by Simply Right as a supervisor during some of the relevant time period. Raya testified that her job duties included recruiting employees for Simply Right, training cleaners, checking their work and coaching cleaners who did not do a good job, ensuring the cleaners kept track of their time, and serving as a contact with whom Cinemark could communicate when the theaters were not cleaned properly. Deposition of Armida Raya, September 27, 2016 ("Raya Dep."), 42–48, 50–52, ECF No. 123-5.

13.  Raya also recommended to Simply Right's Vice President/Director of Operations Beatrice Permann ("Permann") how much each cleaner would be paid, once Permann provided the "budget" for that particular theater. *Id.* 108: 1-24.

14.  Raya was alerted to "problems in the cleaning" by Cinemark managers in Fort Collins, Boulder, and Aurora. *Id.* 47: 12-24. She "never had problems" with cleaners at the Greeley theater. *Id.* 102: 7-15.

15.  Between April 2013 and the present, Cinemark employed at least fifteen different managers

at the Greeley theater.

16.     Cinemark managers never asked Raya to specifically hire or fire any janitor who performed work at the Greeley theater.  *Id.* 167: 20-25, 168: 1-4.

17.     Cinemark did not maintain personnel files, time records, pay stubs, or government employment forms for Plaintiffs or other Simply Right cleaners who cleaned for Simply Right at the Greeley theater.

18.     Raya arranged and attended with Cinemark managers the monthly inspections of the theaters she supervised.  Approximately two to three times during Raya's employment with Simply Right, Cinemark managers at the Greeley theater asked cleaners to accompany Raya and the manager on inspection "walks."  *Id.* 142: 19-25; 143: 7-25.

19.     Cinemark did not track the Simply Right cleaners' arrival and departure times, and it did not receive lists from Simply Right identifying who the cleaners were that Simply Right assigned to its theaters.

20.     Based on movie schedules, Cinemark managers notified Raya of "what time they would like for [the cleaners] to start" work, and Raya would notify the cleaners.  *Id.* 110: 15-25, 111: 1-11.

21.     Cinemark purchases the chemicals and cleaning supplies used to clean the Greeley theater, so it can ensure the products used in its theaters "are environmentally friendly and … lower the risk of exposure to its customers of any contaminants."  JSA, Addendum A.

22.     Opt-in Plaintiffs Maribel Arreola ("Maribel") and Nazario Arreola ("Nazario") (ECF No. 7)[5] worked for Simply Right cleaning at the Greeley theater between April 21, 2014 and May 13,

---

[5]The Court will follow the parties' practice of referring to certain Plaintiffs by their first names because they share the same last name.

2015. Maribel and Nazario claim they worked seven days a week during this roughly 13-month time period (or, approximately 388 days).

23.     In or around April 2014, Plaintiff Jose Luis Arreola ("Jose Luis") told his brother Nazario about the work he was doing with Simply Right.  Jose Luis explained that Simply Right was hiring cleaners, and he set up an appointment for Nazario and his spouse, Maribel, to meet with Permann of Simply Right at a Fort Collins hotel about employment.   Nazario and Maribel interviewed only with Permann; no one from Cinemark was present for the interview meeting.

24.     At this meeting, Nazario completed and signed an Employment Application with Simply Right, and well as W-4 and I-9 employment forms.  Nazario also signed a copy of Simply Right's "Golden Work Rules" and an acknowledgment that he received a copy of Simply Right's Employee Handbook.

25.     Permann discussed with Maribel and Nazario the amounts Simply Right would pay them for work at the Greeley theater

26.     Cinemark never provided Nazario or Maribel with paperwork, written rules, or an employee handbook.

27.     During their employment with Simply Right, Nazario and Maribel cleaned only the Cinemark theater in Greeley.  The cleaners assigned specific areas of the theater to be cleaned among themselves.

28.     During the time he worked for Simply Right, Nazario was never asked to do any work at the Greeley theater other than cleaning and no Cinemark employee told him to do something or gave him direction or instructions.  Deposition of Nazario Arreola Ramos, October 25, 2016 ("Nazario Dep."), 115: 3-9.  However, a Cinemark employee criticized him for "not mopping correctly" and

for a bathroom not being "clean enough."  *Id.* 105: 5-22.

29.    Maribel testified that Cinemark employees "check[ed] the work that [they] had done in the morning."  Deposition of Maribel Arreola, September 30, 2016 ("Maribel Dep.") 19:21-25, 20: 1-2, ECF No. 123-10.  "A supervisor would come and check the rooms that we had cleaned. And if there was something they didn't like, they would tell us to go back and finish the cleaning."  *Id.* 14: 19-25, 15: 1.  Also, after Maribel had finished cleaning one night, "the young woman manager[ ] told us that one of the rooms really smelled because somebody had vomited in there," and she also said, "there was another chemical that we could apply to the seats to remove the smell."  *Id.* 30: 15-25, 31: 1-4.  Moreover, on one occasion, a Cinemark manager to whom the cleaners referred as "Easy Money" (because he joked that their work was "easy money"), asked Maribel to interpret for him some instructions to two other cleaners: "he said that the bathrooms smelled like urine, and he wanted them to use another chemical, and he was going to show them how to use it."  *Id.* 28: 7-24, ECF No. 134-5.  "First we got the chemicals, and then we went to the bathroom. And he explained to them where he wanted to place those chemicals in and around the bathroom and down the drain."  *Id.* 29: 4-10.  "That same manager . . . told us [once] that there was too much gum on the floor that we had to clean. And there were some seats that we needed to clean that were not clean."  *Id.* 30: 2-14.

30.    Nazario received paychecks from Simply Right, and neither Nazario nor Maribel received payments from Cinemark for their work.

31.    Nazario never discussed the pay he received from Simply Right, or about whether Simply Right paid Maribel, with anyone at Cinemark.  Likewise, Maribel never discussed her pay with Cinemark employees.

32.     Knowing Cinemark's requirement that, daily, the theater needed to be cleaned by 10:30 a.m. (Maribel Dep. 18: 17-25), Maribel and Nazario determined whether to arrive at work at 5:00 a.m. or 5:30 a.m. based on various factors. *Id.* 54: 4-20. Neither Nazario nor Maribel was aware of any Cinemark employee keeping track of their hours.

33.     Maribel and Nazario had telephone numbers for Simply Right supervisors Permann and Leo Parra ("Parra"). Parra gave Maribel and Nazario the key to the Greeley theater but also came to the theater when there was going to be an inspection because "he wanted everything to be all right."

34.     Maribel called Parra and Permann when one of the vacuums did not work properly. When Nazario and Maribel decided to quit working at Simply Right, Maribel called and told Parra. In response, Permann called Maribel and offered them more money to continue. Neither Maribel nor Nazario called, emailed, or exchanged text messages with Cinemark managers.

35.     Jose Luis and Clara Arreola ("Clara") cleaned at the Greeley theater from approximately April 1, 2013 (Employment Application, ECF No. 123-13 at 79; Pay Stub, ECF No. 123-13 at 81; Deposition of Jose Luis Arreola, October 27, 2016 ("Jose Luis Dep.") 164: 21-25, 165: 1-4) to May 13, 2015, when they resigned. Jose Luis and Clara allege they worked nearly every day during this period.

36.     During their employment with Simply Right, Jose Luis and Clara cleaned only the Cinemark theater in Greeley.

37.     On March 30, 2013, Jose Luis completed an Employment Application, as well as W-4 and I-9 forms, for Simply Right. Jose Luis and Clara interviewed with and were signed up to clean by Simply Right supervisor, Armida Raya.

38.     Jose Luis received paychecks from Simply Right, and neither Jose Luis nor Clara received

payments from Cinemark for their work.

39.     Neither Clara nor Jose Luis ever discussed with anyone from Cinemark that Clara was not being paid by Simply Right.

40.     Jose Luis claims he or another cleaner showed a Cinemark manager a paystub around the time they were thinking about quitting due to problems with Simply Right.

41.     Neither Jose Luis nor Clara received any written work rules or employee handbook from Cinemark.

42.     During the time they cleaned at the Greeley theater, Jose Luis and Clara mostly decided with the other cleaners how they would "split up" the work necessary to clean the building.  Jose Luis Dep. 55: 2-6; *see also id.* 61: 2-5 ("there wasn't a lot of communication with [the supervisor]. So, it ended up being that we had to organize ourselves in order to figure out how to do the job faster.").

43.     Jose Luis and Clara were initially trained on how to clean the theater by two other Simply Right cleaners, Daniel Hernandez and Benita Arreola.

44.     During the period that Jose Luis and Clara cleaned the Greeley theater, there were times when they and the other janitors were in the building and no Cinemark employees were there.

45.     Jose Luis was instructed by Simply Right to use a telephone number to clock in for work with Simply Right.  Jose Luis had cell phone numbers for his Simply Right supervisors. He did not have telephone numbers for any Cinemark manager.

46.     When Jose Luis and Clara wanted to take time off, they contacted their Simply Right supervisor.

47.     Neither Jose Luis nor Clara were ever asked by Cinemark managers to sell movie tickets for Cinemark, hang movie posters, sell food or drink at the concession stand, or stock candy or food.

48.     Jose Luis testified that Cinemark managers "would identify problem areas that needed more attention . . . the supervisor would ask who is cleaning this area in order to talk to that person to tell the person that they need to put more care in a certain area."  Jose Luis Dep. 61: 5-11.  "[T]he supervisor, last name Hidalgo . . . told me the changes that need to be done, for instance, if I needed to move some arcade games, the video games. He will tell me where to move it or he would tell me what chemicals I could use in order not to ruin the machine."  *Id.* 61: 14-19.  He stated that if Cinemark managers "had inspections they would tell us what areas to concentrate on or what to clean."  *Id.* 63: 2-4.  Also, Hidalgo asked him to clean "the area where they have the cups and the area where they have like the window displays . . ., but [Armida Raya] had told me that that [sic] was not part of the contracts and that that [sic] had to be done by Cinemark employees."  *Id.* 67: 5-25, 68: 1-7.  "I kept on cleaning that area because the supervisor insisted . . . [s]omething else that I did that he told me that I had to do was move the popcorn machines."  *Id.* 68: 8-16.  Jose Luis asserted he would call Simply Right supervisors "on rare occasions because the people that I had more contact with were the cinema – the movie theater managers."  *Id.* 84: 24-25, 85: 1-6.  He explained that the Simply Right supervisors "were always busy cleaning other theaters."  *Id.* 84: 8-14.  Jose Luis also said that Hidalgo directed that they finish cleaning the theater by 8:00 a.m. and "there were other occasions where he told me I had to stay because he had to check the auditoriums and they were not right."  *Id.* 133: 17-23; 136: 21-25, 137: 1-4.

49.     Clara testified that she saw Simply Right supervisor Raya maybe once a week when Raya might get a complaint from Hidalgo, and Simply Right supervisor Parra never answered her calls. Deposition of Clara Arreola, October 27, 2016 ("Clara Dep.") 51: 6-22; 53: 2-22.  "The one who was almost [sic] there was Mr. Hidalgo and he was more likely to solve our problems."  *Id.* 53: 23-

25, 54: 1-3.  "Hidalgo complained about the pink chemical that could be seen in the toilets in the bathroom, so on some occasions Hidalgo told my husband when we were on our way out and he showed him the bathrooms and said, look, you can see this pink ring and you shouldn't be doing that so you need to come to clean better." *Id.* 51: 11-17.  Clara also testified that Hidalgo instructed her to "dust the high area in the bathrooms", "make sure that we cleaned the [ice melting] salt very well, that there was no salt in the corners," "make sure that I get rid of . . . lint stuck in the corners" of the bathrooms, and "clean[ ] the trash cans all the way to the bottom." *Id.* 80: 14-23; 81: 14-19; 82: 3-14. She also described an instance where Raya called her during non-work hours and instructed her to go to the theater to replace toilet paper; when she arrived, "Elizabeth, who was another of the managers . . . said, oh, please put the toilet paper and I said are you going to pay me for this time because this is not my work time, and she said please change the toilet paper and when I asked that question she sort of laughed and didn't answer." *Id.* 52: 13-19.  Also, "when the Cinemark employees were done in the kitchen, they would tell me you can come in now." *Id.* 64: 17-19. When attempting to give an estimate of how much time it took to clean the theater each day, Clara testified that it was difficult to give because, as time went on, Cinemark managers "added more [cleaning] tasks and more tasks and more tasks were added." *Id.* 69: 12-25, 70, 71: 1-3.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit

under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the

evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Under the FLSA, an "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). An "employee" is defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The FLSA "defines the verb 'employ' expansively to mean, 'suffer or permit to work.'" *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (quoting 29 U.S.C. § 203(g)). "The 'striking breadth' of these definitions 'stretches the meaning of "employee" to cover some parties who might not qualify as such under a strict application of traditional agency principles.'" *Johnson v. Unified Gov't of Wyandotte Cnty., Kan.*, 371 F.3d 723, 729 (10th Cir. 2004) (quoting *Darden*, 503 U.S. at 326).

Any "employer" of an "employee" is "responsible, both individually and jointly, for compliance with all of the applicable provisions of the" FLSA. *See* 29 C.F.R. § 791.2(a). In determining whether an entity is "jointly responsible" with the employer under the FLSA, courts analyze whether the claimants constitute "employees" of the entity. *See Harbert v. Healthcare Servs. Grp., Inc.*, 173 F. Supp. 2d 1101, 1105 (D. Colo. 2001) (citing *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964) (finding status of employer as independent contractor is immaterial because focus of joint employment inquiry is on *employees*, not employers) (emphasis in original). The

Department of Labor's ("DOL") regulation[6] outlining when multiple parties may be jointly liable under the FLSA provides:

> (b) Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
>
> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
>
> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 U.S.C. § 791.2.  It is undisputed here that Cinemark and Simply Right have no "arrangement" to share the Plaintiffs' cleaning services, and the parties raise no argument that the entities are acting in each other's interest in relation to the Plaintiffs; accordingly, the Court will focus its analysis on the level of control Cinemark has (if any) over the Plaintiffs' employment pursuant to § 791.2(b)(3).

The Tenth Circuit has not addressed directly the standard(s) by which a district court must analyze "joint employment" under the FLSA.  But, in analyzing whether a plaintiff was an employee protected by the FLSA or simply an independent contractor, the court instructed:

> Thus, in determining whether an individual is covered by the FLSA, "our inquiry is not limited by any contractual terminology or by traditional common law concepts of 'employee' or 'independent contractor.'" *Henderson v. Inter–Chem Coal Co.,*

---

[6]"Since Congress has not directly addressed the issue of when a joint-employer relationship exists, and since the regulations enacted by the DOL are based on a permissible reading of the FLSA, this Court grants deference to the DOL's regulations." *Harris v. Universal Contracting, LLC,* 2014 WL 2639363, at *5 (D. Utah Jun. 12, 2014) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)).

> *Inc.*, 41 F.3d 567, 570 (10th Cir. 1994) (citing *Dole v. Snell*, 875 F.2d 802, 804 (10th Cir. 1989)). Instead, the economic realities of the relationship govern, and "the focal point is 'whether the individual is economically dependent on the business to which he renders service ... or is, as a matter of economic fact, in business for himself.'" *Id.* The economic reality test includes inquiries into whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records. *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990).
>
> In applying the economic reality test, courts generally look at (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business. *Henderson*, 41 F.3d at 570. In deciding whether an individual is an employee or an independent contractor under the FLSA, a district court acting as the trier of fact must first make findings of historical facts surrounding the individual's work. Second, drawing inferences from the findings of historical facts, the court must make factual findings with respect to the six factors set out above. Finally, employing the findings with respect to the six factors, the court must decide, as a matter of law, whether the individual is an "employee" under the FLSA. *Id.* at 571. None of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach. *Id.* at 570.

*Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1440–41 (10th Cir. 1998). *Baker*'s analysis has been utilized by some district courts in this circuit when determining whether a joint employer relationship exists. *Matrai v. DirecTV, LLC*, 168 F. Supp. 3d 1347, 1353 (D. Kan. 2016); *see also Beltran v. InterExchange, Inc.*, 176 F. Supp. 3d 1066, 1079 (D. Colo. 2016).   While the Tenth Circuit had occasion in *Johnson*, *supra*, to address how the "joint employer" issue should be analyzed, the court determined not to, instead limiting its analysis to whether the plaintiffs in that case were independent contractors, as opposed to employees, using the *Baker* factors.  371 F.3d at 728.[7]  In so doing, the Tenth Circuit essentially distinguished between an employee/independent

---

[7]The court described the issues in *Johnson* as whether the plaintiffs presented sufficient evidence to the jury "that they were employees of the Housing Authority, as opposed to

contractor analysis and a joint employer analysis. *See id.*

At least one district court in this circuit has recognized (indirectly) such distinction when noting that "[b]ecause the inquiry in this case is one of joint employer status rather than employee status, the factors applied in those cases [including *Baker* and *Johnson*] are not directly applicable." *Zachary v. Rescare Okla., Inc.*, 471 F. Supp. 2d 1175, 1179 (N.D. Okla. 2006) (citing *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61, 67–68 (2d Cir. 2003)) (noting that factors such as those considered in *Henderson* and *Johnson*, including the workers' investment in the business and the degree of skill and independent initiative required of workers, are used primarily to distinguish independent contractors from employees and therefore "do not bear directly on whether workers who are already employed by a primary employer are also employed by a second employer"). In *Zachary*, the court listed four factors "most commonly applied" in this context—whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, or (4) maintained employment records (*id.* (citing *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983))—but concluded that "[r]egardless of the specific factors used, the concept of joint employment should be 'defined expansively,' and the Court must always consider the 'economic realities' of the employment relationship in light of all circumstances presented." *Id.* (citation omitted).

---

independent contractors; that the Housing Authority and the Unified Government *should be regarded as joint employers*; and that they had worked more than [the statutory] hours in any week for which they sought recovery." *Johnson*, 371 F.3d at 727–28 (emphasis added). The court found, "Because we conclude that sufficient evidence supported the jury findings that the plaintiffs were not employees of the Housing Authority, but were instead functioning as independent contractors when they patrolled as security guards, we will not decide the other issues mentioned above." *Id.* at 728.

With these legal principles in mind, the Court agrees that certain of the *Baker* factors are not, or may not be, applicable here and will proceed to consider any factors that reasonably apply to the circumstances presented while employing a totality-of-the-circumstances approach. *Baker*, 137 F.3d at 1440–41.

## I.    *Bonnette* Factors

The Court concludes that Plaintiffs have failed to demonstrate genuine issues of material fact as to whether Cinemark had the power to hire and fire the Plaintiffs, determined the rate and method of payment to the Plaintiffs, and maintained Plaintiffs' employment records.   The evidence is uncontroverted that Cinemark engaged in none of these practices with respect to the Plaintiffs. Although Plaintiffs attempt to argue that the JSA "sets the terms of payment" to the cleaners, the Court finds the JSA actually provides: Simply Right "shall be solely responsible for the salary, worker's compensation, income tax withholding, unemployment, FICA, and all other aspects of employment regarding [Simply Right's] employees."   JSA II. § 2.14.   There is nothing in the JSA that can be construed as giving Cinemark the power to control or determine (as opposed to "affect") the Plaintiffs' pay. *See Jean-Louis v. Metro. Cable Comm'cns, Inc.*, 838 F. Supp. 2d 111, 129–30 (S.D. N.Y. 2011) ("the test is whether a putative joint employer determines pay rates, not whether it affects them.").   Thus, the Court recommends that Judge Moore find these factors weigh against a finding of "joint employment."

The only *Bonnette* factor remaining is whether Cinemark "supervised and controlled employee work schedules or conditions of employment," which the Court equates with the first *Baker* factor concerning the nature and degree of control over the claimants.

II.     **Cinemark's Nature and Degree of Control Over Plaintiffs**

One court in this district analyzed a joint employer relationship focusing on whether the purported employer "possessed sufficient indicia of control" by considering "the nature and structure of the employment relationship . . . to determine whether the economic realities justify a finding of joint employment." *Harbert*, 173 F. Supp. 2d at 1106.   In so doing, the court looked at whether the alleged employer not only paid the claimant's salary and benefits, but also whether it determined the work schedule, work responsibilities, and work conditions of the claimant. *Id.*  The Court will consider each of these latter factors to determine Cinemark's nature and degree of control, if any, over the Plaintiffs.

A.     <u>Work Schedule</u>

The JSA provides that Simply Right agreed with Cinemark to perform cleaning services "nightly between box office close and two hours prior to theater opening."  JSA Addendum A, § V.a.  In addition, Simply Right's "Golden Work Rules" direct its cleaners to "[a]rrive at the theater between 1:00 and 2:00 a.m."  ECF No. 123-4 at 29.

However, Simply Right Supervisor Armida Raya testified that, based on movie schedules, Cinemark managers notified her of "what time they would like for [the cleaners] to start" work, and Raya would then notify the cleaners.  Raya Dep. 110: 15-25, 111: 1-11.  In addition, knowing Cinemark's requirement that, daily, the theater needed to be cleaned by 10:30 a.m. (Maribel Dep. 18: 17-25), Maribel and Nazario determined whether to arrive at work at 5:00 a.m. or 5:30 a.m. based on various factors. *Id.* 54: 4-20.  Clara also testified that she was not allowed to start cleaning the lobby or restrooms until the public was gone or to start cleaning the auditoriums until the movies were finished, so her start time depended on when the first movie of the final showings for the day

ended.  Clara Dep. 61: 7-25, 62: 1-3.  She also testified that she was admonished by Cinemark employees for finishing her work as late as 8:30 a.m.  *Id.* 66: 8-19.  Finally, Jose Luis testified that Hidalgo directed they finish cleaning the theater by 8:00 a.m. each day, and "there were other occasions where he told me I had to stay because he had to check the auditoriums and they were not right."  Jose Luis Dep. 133: 17-23; 136: 21-25, 137: 1-4.

The Court finds these facts are material in determining whether Cinemark controlled, or shared with Simply Right the control of, the Plaintiffs' work schedules.  Jacob Hidalgo, Cinemark's Senior Assistant Manager of the Greeley theater during the relevant time, testified that he "did not instruct any Simply Right cleaner when to clean particular areas of the theatre or when the cleaners needed to start work or stop work."  Declaration of Jacob Hidalgo, January 19, 2017 ("Hidalgo Decl.") ¶ 8, ECF No. 151-14.  Accordingly, the Court concludes material disputed facts exist as to whether Cinemark exercised some degree of control over the Plaintiffs' work schedules.

B.     Work Responsibilities

The JSA reserves to Simply Right the right of direction and control over the cleaners assigned to Cinemark's work sites, including the right to hire, fire, supervise, discipline, and reassign the cleaners.  *Id.* II. § 2.7.  But, Addendum A to the JSA includes a "list of proposed guidelines" provided by Cinemark to Simply Right describing both daily and weekly cleaning services needed for different areas of a theater.  ECF No. 124 at 30–32.  The list includes, for example:

**II. Daily Service**:

a. Auditoriums/Game Rooms/Lobby/Common Hallways/All Public Areas

    1. Pick up trash compact it or place in the dumpster/container outside.
    2. Remove dust, debris and spills from auditorium seats and floors, including

removable stains and gum. Sweep, vacuum and mop auditoriums daily. Blowers are strictly prohibited in the building.

3.  Empty trash receptacles and replace liners in and wipe down receptacles as needed.

4. Sweep and mop tile, concrete flooring and elevator floors.

5. Vacuum carpeted areas and throw mats.

6. Spot vacuum carpeted walls.

7. Remove gum from carpets, mats and floors.

8. Clean, polish, and sanitize drinking fountains

9. Clean ALL doors interior and exterior including hardware.

10. Organize and clean all janitorial supply closets.

* * * *

b. Customer Restrooms (All restroom supplies will be furnished by the theatre):

l. Sweep floor

2. Clean and disinfect commodes, urinals, lavatories, faucets, sinks, fixtures, pipes and all tile.

3. Clean mirrors

4. Remove finger marks and smudges from doors. Clean any graffiti from stalls and walls

5. Mop and disinfect floor (with particular attention around and behind commodes).

* * * *

e. Food and Beverage Areas:

1. Clean poppers as applicable.

2. Remove mats and place in designated place.

3. Sweep and mop floor.

4. Clean scullery floor and sinks as applicable.

5. Mop floor in Dining Area only .... Move tables (if movable) and trash receptacles to mop under and around.

6. Clean all tables and chairs in restaurant and cafe areas

### III.   Weekly:

a. Auditoriums/Lobby/Common Hallways:

1. Vacuum carpeted walls.

2. Clean and sanitize auditorium entry doors.

3. Wash and sanitize interior of garbage cans.

22

4. Dust lights and vents under 10 feet.
5. Dust and clean all benches[.]

*Id.* Supervisor Raya testified that approximately two to three times during her employment with Simply Right, Cinemark managers at the Greeley theater asked cleaners to accompany Raya and the manager on inspection "walks." *Id.* 142: 19-25; 143: 7-25.

Jose Luis testified that Cinemark managers "would identify problem areas that needed more attention," and "ask who is cleaning this area in order to talk to that person to tell the person that they need to put more care in a certain area." Jose Luis Dep. 61: 5-11. Also, Hidalgo instructed Jose Luis to move some video games, where to move them, and what chemicals to use to avoid ruining the machine. *Id.* 61: 14-19. Jose Luis stated that if Cinemark managers "had inspections they would tell us what areas to concentrate on or what to clean." *Id.* 63: 2-4. Also, Hidalgo asked Jose Luis to clean "the area where they have the cups and the area where they have like the window displays" although Raya had told him that such cleaning was not part of the contract. *Id.* 67: 5-25, 68: 1-7. Nevertheless, Jose Luis"kept on cleaning that area because the supervisor insisted . . . [s]omething else that I did that he told me that I had to do was move the popcorn machines." *Id.* 68: 8-16. Moreover, once when Jose Luis was at the movie theater with his family to see a movie, Hidalgo approached him and told him that "from now on before you leave when you finish your job start folding the carpets . . . that are in the lobby." *Id.* 149: 18-25, 150, 151: 1-21.

In addition, Clara testified that she rarely saw or communicated with Simply Right supervisors, but "[t]he one who was almost [sic] there was Mr. Hidalgo and he was more likely to solve our problems." Clara Dep. 53: 23-25, 54: 1-3. "Hidalgo complained about the pink chemical that could be seen in the toilets in the bathroom, so on some occasions Hidalgo told my husband when we were on our way out and he showed him the bathrooms and said, look, you can see this

pink ring and you shouldn't be doing that so you need to come to clean better." *Id.* 51: 11-17.  Clara also testified that Hidalgo instructed her to "dust the high area in the bathrooms," "make sure that we cleaned the [ice melting] salt very well, that there was no salt in the corners," "make sure that I get rid of . . . lint stuck in the corners" of the bathrooms, and "clean[ ] the trash cans all the way to the bottom." *Id.* 80: 14-23; 81: 14-19; 82: 3-14.

Finally, Maribel testified that Cinemark employees "check[ed] the work that [they] had done in the morning." Maribel Dep. 19:21-25, 20: 1-2.  "A supervisor would come and check the rooms that we had cleaned. And if there was something they didn't like, they would tell us to go back and finish the cleaning." *Id.* 14: 19-25, 15: 1.  Also, after Maribel had finished cleaning one night, a young female manager told the cleaners that one of the rooms smelled of vomit and instructed them to use another chemical to remove the smell. *Id.* 30: 15-25, 31: 1-4.  Moreover, on one occasion, a Cinemark manager asked Maribel to interpret for him some instructions to two other cleaners: "he said that the bathrooms smelled like urine, and he wanted them to use another chemical, and he was going to show them how to use it." *Id.* 28: 7-24, ECF No. 134-5.  "First we got the chemicals, and then we went to the bathroom. And he explained to them where he wanted to place those chemicals in and around the bathroom and down the drain." *Id.* 29: 4-10.  "That same manager . . . told us [once] that there was too much gum on the floor that we had to clean. And there were some seats that we needed to clean that were not clean." *Id.* 30: 2-14.

The Court finds these facts are material in determining whether Cinemark had control, or shared control with Simply Right, over the Plaintiffs' duties and responsibilities.  Mr. Hidalgo testified that he

> did not direct janitors to clean areas they had missed, correct areas that were not well cleaned, or perform additional cleaning tasks. I did not instruct janitors what areas

24

to clean or show them how they were to perform their job. I did not communicate with any janitor to say I thought they were no doing a job task correctly or say they should put more effort into a given task or do a better job of cleaning.  I understood from Cinemark that I was to address all issues concerning the cleanliness of the theatre to Simply Right through a Simply Right manager or supervisor, and I did so.

Hidalgo Decl. ¶¶ 5, 6. Jason Buice and Sean Stengl, who served as General Managers at the Greeley theater during the relevant time period, proffered essentially the same testimony.  *See* Declaration of Jason Buice, January 18, 2017 ("Buice Decl.") ¶¶ 4, 6, ECF No. 151-12; Declaration of Sean Stengl, November 10, 2016 ("Stengl Decl.") ¶ 8, ECF No. 151-11.  Consequently, the Court concludes disputed facts exist as to whether Cinemark exercised some degree of control over the Plaintiffs' work responsibilities.

     C.    <u>Work Conditions</u>

It is undisputed that all Plaintiffs testified they, as employees of Simply Right, worked at no business other than the Greeley Cinemark theater.  Under the JSA, Cinemark is responsible for purchasing the chemicals and cleaning supplies used to clean the Greeley theater, and it does so to ensure the products used in its theaters "are environmentally friendly and … lower the risk of exposure to its customers of any contaminants."  JSA, Addendum A.  Also, "[Simply Right] is responsible for distributing such cleaning supplies, as deemed necessary by [Cinemark] with its janitors. [Cinemark] will not provide cleaning supplies directly to [Simply Right]'s staff, but may have a designated area where [Cinemark] will provide these supplies for [Simply Right]."  *Id.* Simply Right's "Golden Work Rules" instruct its cleaners to "[n]otify your supervisor immediately when you need supplies, cleaning chemicals, or the equipment breaks."  ECF No. 123-4.

Maribel testified that Leo Parra told her, "if we needed chemicals or anything like that, we should ask the movie people."  Maribel Dep. 26: 23-25, 27: 1-5.  Also, on one occasion, a Cinemark

manager asked Maribel to interpret for him some instructions to two other cleaners: "he said that the bathrooms smelled like urine, and he wanted them to use another chemical, and he was going to show them how to use it." *Id.* 28: 7-24. "First we got the chemicals, and then we went to the bathroom. And he explained to them where he wanted to place those chemicals in and around the bathroom and down the drain." *Id.* 29: 4-10. Maribel also testified that she called her Simply Right supervisor directly when one of the vacuums did not work properly.

Jose Luis testified that a Cinemark manager "would tell me what chemicals I could use in order not to ruin the [video] machine." Jose Luis Dep. 61: 14-19. He also stated he would call Simply Right supervisors "on rare occasions because the people that I had more contact with were the cinema – the movie theater managers." *Id.* 84: 24-25, 85: 1-6. He explained that the Simply Right supervisors "were always busy cleaning other theaters." *Id.* 84: 8-14. Likewise, Clara testified that she saw Simply Right supervisor Raya maybe once a week and Simply Right supervisor Parra never answered her calls. Clara Dep. 51: 6-22; 53: 2-22. "The one who was almost [sic] there was Mr. Hidalgo and he was more likely to solve our problems." *Id.* 53: 23-25, 54: 1-3. There were also hours when the Plaintiffs worked at the theater during which no Cinemark employee was present.

The Court finds a reasonable jury could conclude from these facts that Cinemark exercised some degree of control over the Plaintiffs' work conditions at the Greeley theater.

D.     "Degree" of Control

Before the Court concludes that summary judgment in Cinemark's favor is improper based on the disputed facts, I must consider whether the "degree" of the control exhibited by the disputed facts is sufficient to recommend sending Plaintiffs' FLSA claims against Cinemark to a jury. *See*

*Harbert*, 173 F. Supp. 2d at 1106 (an entity may constitute a "joint employer" under the FLSA if it "possesse[s] sufficient indicia of control.").

In *Zheng*, the Second Circuit reasoned that "*extensive* supervision [by a general contractor over the work of an individual employed by a subcontractor] weighs in favor of joint employment only if it demonstrates *effective* control of the terms and conditions of the plaintiff's employment." *Zheng*, 355 F.3d at 75 (citing *Rutherford*, 331 U.S. at 726) (emphasis added). "By contrast, supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement." *Id.* (citing *Moreau v. Air France*, 343 F.3d 1179, 1188 (9th Cir. 2003) (internal citations omitted)).

The Eleventh Circuit defines the degree of control as:

"Control arises ... when the [purported joint employer] goes beyond general instructions ... and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work." *Aimable* [*v. Long & Scott Farms*], 20 F.3d [434], 441 [(11th Cir. 1994)] (explaining that although an agricultural company's decisions about what to plant and how much land to use showed "abstract" control over farm workers, that type of control did not constitute control for FLSA purposes). A purported employer takes an overly active role in the oversight of work "when it decides such things as (1) for whom and how many employees to hire; (2) how to design the employees' management structure; (3) when work begins each day; (4) when the laborers shall start and stop their work throughout the day; and (5) whether a laborer should be disciplined or retained." *Martinez–Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1209–10 (11th Cir. 2003) (quotation marks and citation omitted) (discussing "nature and degree of control" factor as set forth in *Aimable*). When assessing the nature and degree of control, our "focus is more properly limited to specific indicia of control." *Aimable*, 20 F.3d at 440.

*Layton*, 686 F.3d at 1178.

In this case, the disputed facts demonstrate that Cinemark managers "beg[a]n to assign specific tasks" to the Plaintiffs, including tasks apparently not contemplated by the JSA, and they

determined times at which the Plaintiffs could start their work in the evening (based on movie schedules) and finish their work in the morning.  The testimony also demonstrates that the Plaintiffs were told by their Simply Right supervisor(s) to report to Cinemark managers with problems or questions, and the managers provided the needed information or equipment.   A reasonable jury could conclude that, for those tasks (including extra-contractual) assigned by Cinemark, the Plaintiffs believed that their work was properly supervised by Cinemark, and they were required to comply with the managers' orders and directives.  Under these circumstances, the Court finds the disputed facts demonstrate sufficient indicia of control and recommends that Judge Moore weigh these factors in favor of a "joint employer" finding.

## III.    Other Applicable Factors

Both parties also argue that consideration of the following factors supports their positions: (1) whether the Plaintiffs were part of a business organization[8] that could or did shift as a unit from one putative joint employer to another; (2) whether the Plaintiffs provided services that were integral to Cinemark's business; (3) whether responsibility for the contract with Simply Right could pass from one subcontractor to another without material changes; and (4) whether the Plaintiffs performed "specialty" work.

### A.    Contractor Shift as a Unit

The question here is not only whether Simply Right's business *did* shift from one contractor to another, but whether it *could*.  *Jean-Louis*, 838 F. Supp. 2d at 132.  This factor "is relevant because a subcontractor that seeks business from a variety of contractors is less likely to be part of

---

[8]The Court notes that the term "business organization" might also refer to a union (*see Rutherford*, 331 U.S. at 725); however, the Court could find no case interpreting this factor as such.

a subterfuge arrangement than a subcontractor that serves a single client." *Id.* (quoting *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61, 72 (2d Cir. 2003)).

Here, it is undisputed that Simply Right is a janitorial services contractor that is "in the business of providing [janitorial services] to the general public and other businesses." Plaintiffs argue that the factor considers whether they, themselves, seParrately owned a business that could or did shift as a unit; however, the Court finds Plaintiff's interpretation unpersuasive and unsupported by the law. *See Torres-Lopez v. May*, 111 F.3d 633, 640 (9th Cir. 1997) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 731 (1947)).[9] Thus, Cinemark is not Simply Right's only contractor, and the Court recommends concluding this factor weighs against a finding of joint employment.

B.      Integral Services

The Court agrees with Plaintiffs that their work at the theater was integral to its function as a movie theater "exhibiting movies" to the public. Certainly, most members of the public would be averse to frequenting a theater whose bathrooms and auditoriums were dirty and foul-smelling.

Cinemark argues that the Plaintiffs' work was not "integral" because it was not production work performed alongside Cinemark's employees and was primarily performed after hours. The Court disagrees that these requirements are necessary to constitute "integral" work. However, the Court agrees with Cinemark that "interpreted broadly, this factor could be said to be implicated in every subcontracting relationship, because all subcontractors perform a function that a general

---

[9]In *Torres-Lopez*, unlike here, the plaintiffs were farm workers who were not employees of any company; "[r]ather, individual farmworkers would learn by word of mouth that the cucumbers were ready for picking and find their own way to the cucumber field. Ag–Labor then selected the farmworkers from the labor pool that showed up." *Id.* at 644.

contractor deems 'integral' to a product or service." *Zheng*, 355 F.3d at 73. Accordingly, the Court recommends placing the appropriate weight on this factor, keeping in mind the Second Circuit's admonition.

C.   Passing of Contract Responsibilities

On its face, the Court might agree with Plaintiffs that obligations and responsibilities under the JSA could pass from one cleaning subcontractor to another without any material changes. However, this observation does not take into account the Supreme Court's concern about the workers themselves. In *Rutherford*, the Supreme Court explained that the workers in a slaughterhouse were supervised by a single individual who contracted the work with a packing company and, as each supervisor (at least three) "abandoned" his post, the work was taken over by certain subordinates who had already been there and working. *Rutherford*, 331 U.S. at 724–25. Thus, the Supreme Court recognized that supervision responsibilities of these workers passed from one supervisor to the next with little, if any, changes, including that the work was performed by the same individuals who had been already working there. *Id.* Based on this proposition, Cinemark argues that because the Plaintiffs were not "tied" to it—*i.e.*, they did not work for Cinemark before or after their employment with Simply Right—this factor weighs against joint employment.

The Court finds that, for this factor, it must not only determine whether the JSA's provisions and obligations could "pass" easily from one subcontractor to the next, but also consider that the "material changes" qualifier includes whether such "pass" would result in the termination of the Plaintiffs' services at Cinemark. Here, there is no indication that, had Simply Right or Cinemark terminated the JSA, the Plaintiffs would continue to work at the Greeley theater. Therefore, the Court recommends Judge Moore find this factor weighs against a finding of joint employment.

D.    Specialty Work

Plaintiffs also argue that the work they performed required no specialized skills, training, or certification and, thus, "is indicative of employee status."  The Court agrees with this proposition, but notes that this factor is actually derived from the Supreme Court's opinion in *Rutherford* where

> the Court focused on the fact that the workers completed one process in the middle of a series of interdependent steps at the slaughterhouse. The facts led the Court to conclude that the workers "did a specialty job on the production line" that was "more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor." *Id.* at 730, 67 S.Ct. at 1477. Because the workers were "part of the integrated unit of production" of the slaughterhouse, the Court found them to be employees of the establishment. *Id.* at 729, 67 S.Ct. at 1476.

*Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1180 (11th Cir. 2012) (quoting *Rutherford*, 331 U.S. at 729–30).  In this case, it is undisputed that the Plaintiffs worked on no production line, and the work they performed was not "piecework" in an effort to "complete[] one process in the middle of a series of interdependent steps."  *Id.*  In fact, although cleaning a movie theater is certainly integral to a theater's ability to earn profits by repeat business, the cleaning itself is not a necessary step in the theater's primary business of exhibiting movies.  Therefore, the Court recommends finding that this factor weighs neutrally.

**CONCLUSION**

Of the factors considered, only those concerning Cinemark's degree of control over the Plaintiffs' work schedule, responsibilities, and conditions raise factual issues.  The undisputed facts show Cinemark did *not* have the power to hire, discipline, and fire the Plaintiffs; determine the rate and method of payment to the Plaintiffs; maintain Plaintiffs' employment records; and, design the Plaintiffs' management structure.  Moreover, the facts show the Plaintiffs were part of a business organization, Simply Right, that could shift as a unit from one putative joint employer to another,

and the responsibility for the contract with Simply Right could not pass from one subcontractor to another without material changes, including the termination of the Plaintiffs. Conversely, the facts demonstrate the Plaintiffs worked solely at the Cinemark theater during their employment; Cinemark was contractually responsible for providing the supplies and equipment necessary for Plaintiffs' work; and, the Plaintiffs followed the instructions and directives of Cinemark's managers at the Greeley theater.

Although the *number* of factors weighing against joint employment in this case exceed those in favor, the Court must not rely solely on such computation. In *Layton*, the court listed five principles used to guide its joint employer analysis:

> First, the question in "joint employment" cases is not whether the worker is more economically dependent on the independent contractor or the [alleged employer], with the winner avoiding responsibility as an employer .... [T]he focus of each inquiry must be on each employment relationship as it exists between the worker and the party asserted to be a joint employer.
>
> Second, no one factor is determinative. As we explained in *Aimable*, the existence of a joint employment relationship depends on the economic reality of all the circumstances.
>
> Third, the factors are used because they are indicators of economic dependence. They are aids—tools to be used to gauge the degree of dependence of alleged employees on the business to which they are connected .... Thus, the weight of each factor depends on the light it sheds on the [ ]workers' economic dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case.
>
> Fourth, a joint employment relationship is not determined by a mathematical formula .... The purpose of weighing the factors is not to place each in either the contractor or the [alleged employer's] column, but to view them qualitatively to assess the evidence of economic dependence, which may point to both.
>
> Fifth, in considering a joint-employment relationship, we must not allow common-law concepts of employment to distract our focus from economic dependency.

686 F.3d at 1177–78 (quoting *Antenor v. D & S Farms*, 88 F.3d 925, 932–33 (11th Cir. 1996)

(quotation marks and citations omitted)).  With these principles in mind, the Court concludes that the undisputed facts do not resolve the issue one way or the other, and the disputed facts present a genuine issue as to whether the Plaintiffs were economically dependent on Cinemark.  *See, e.g., Matrai v. DirecTV, LLC*, 168 F. Supp. 3d 1347, 1355–56 (D. Kan. 2016) (court found disputed issues of fact as to whether the purported employer had control over the plaintiffs' assignments, schedules, and performance, and the evidence demonstrated managers "may have imposed and communicated requirements that went beyond the semblance of mere quality control.").

Based on the entire record and for the reasons stated above, the Court respectfully recommends that Defendant Cinemark USA, Inc.'s Motion for Summary Judgment [filed November 11, 2016; ECF No. 123] be **denied**, and Plaintiffs' Motion for Partial Summary Judgment as to Cinemark USA, Inc.'s Status as a Joint Employer [filed November 18, 2016; ECF No. 134] be **denied without prejudice** as to the relief sought by the stayed Plaintiffs and the class and, otherwise, **denied**.

Respectfully submitted at Denver, Colorado, this 27th day of February, 2017.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge